**IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
PANAMA CITY DIVISION**

**JERRY LEE NICHOLS,**

      **Petitioner,**

**vs.**

                                               **CASE NO. 5:06cv58-RS/WCS**

**WALTER A. McNEIL,**

      **Respondent.**

_____/

**<u>SECOND REPORT AND RECOMMENDATION</u>**

This is a petition for writ of habeas corpus filed by Jerry Lee Nichols pursuant to 28 U.S.C. § 2254. Doc. 1. Petitioner challenges his conviction for an attempted lewd and lascivious act upon a child, in the Circuit Court of the Fourteenth Judicial Circuit, in and for Bay County, Florida, case number 02-402H. Respondent filed an answer, doc. 22, and Petitioner filed a traverse, doc. 23, and a supplement (Petitioner's brief and motion on direct appeal), doc. 27.

A report and recommendation was entered on April 8, 2008, recommending that the petition be denied without an evidentiary hearing as to all grounds presented. Doc.

35.  The court adopted that recommendation.  Doc. 40.  Petitioner appealed.  A

certificate of appealability was granted to determine the issue of:

> Whether the district court erred in finding that the appellant's trial counsel
> was not ineffective for failing to inform appellant of a prior plea deal.

Doc. 70-2, p. 2.  The Eleventh Circuit reversed as to this issue.  The court directed:

> We conclude this case should be remanded to the district court for an
> evidentiary hearing on the merits of Nichols' ineffective assistance of
> counsel claim, including: (1) whether Nichols' assertion that he would have
> preferred the February 19 offer is credible; (2) whether Nichols' attorney
> actually failed to convey the plea offer to Nichols; and (3) if so, the exact
> terms and conditions of the plea offer, and counsel's response.

*Id.*, p. 6.

Counsel was appointed for Petitioner, and an evidentiary hearing was held on

September 29, 2009.  Doc. 82 (transcript).  The parties have filed post-hearing

memoranda.  Docs. 86 and 87.

The remand was limited to the issue in the certificate of appealability.  Thus, this

court's ruling as to all other claims and denying the petition is law of the case and will

not be revisited in this report and recommendation.  The only ground still pending is

ground four, as discussed in the prior report and recommendation, doc. 35, pp. 21-24.

I still conclude that state law remedies were exhausted as to ground four.  See

doc. 35, p. 22, incorporated herein by reference.  I note, however, that the claim was

raised as ground one in the *second* Rule 3.850 motion, signed on June 9, 2005, doc.

13, Exhibit H, pp. 10-11 (doc. 13-6, pp. 10-11).  Respondent has not challenged this

ruling.  Thus, this report and recommendation addresses the evidence presented at the

hearing and the merits of ground four as required by the remand.

**Section 2254 Standard of Review**

For claims that were properly exhausted and adjudicated in state court, this court's review is limited. "[A] determination of a factual issue made by a State court shall be presumed to be correct," and Petitioner has "the burden of rebutting the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1); Bui v. Haley, 321 F.3d 1304, 1322 (11th Cir. 2003) (citing the statute, footnote omitted). Moreover, as to a factual issue adjudicated by the state court, Petitioner must show that the adjudication "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." § 2254(d)(2); 321 F.3d at 1322 (citing the statute). Section 2254(d)(2) is satisfied "only if it is shown by clear and convincing evidence that the state court's presumptively correct factual findings do not enjoy support in the record." Lomholt v. Iowa, 327 F.3d 748 , 752 (8th Cir. 2003) (citing § 2254(e)(1), other citation omitted).

As to legal findings, a petitioner is entitled to federal habeas relief only if the state court's adjudication of the merits of the federal claim "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." § 2254(d)(1). "[C]learly established Federal law, as determined by the Supreme Court of the United States," refers only to holdings (rather than *dicta*) of the Supreme Court, but decisions of lower federal courts may be considered to the extent that they demonstrate how those courts applied Supreme Court holdings. Hawkins v. Alabama, 318 F.3d 1302, 1309 (11th Cir. 2003) (citations omitted) ("The decisions of other federal circuit courts (and our decisions for that matter) are helpful to the AEDPA inquiry only to the extent that the

decisions demonstrate that the Supreme Court's pre-existing, clearly established law compelled the circuit courts (and by implication would compel a state court) to decide in a definite way the case before them."). *See also*, <u>Carey v. Musladin</u>, 549 U.S. 70, 74-77, 127 S.Ct. 649, 653-654, 166 L.Ed.2d 482 (2006) (§ 2254 refers to holdings, rather than *dicta*, of the Supreme Court, collecting cases to show that "[r]eflecting the lack of guidance from this Court, lower courts have diverged widely in their treatment of defendants' claims.").

The "contrary to" and "unreasonable application" clauses of § 2254(d)(1) have independent meanings. <u>Williams v. Taylor</u>, 529 U.S. 362, 404-406, 120 S.Ct. 1495, 1519-1520, 146 L.Ed.2d 389 (2000); <u>Bell v. Cone</u>, 535 U.S. 685, 694, 122 S.Ct. 1843, 1850, 152 L.Ed.2d 914 (2002) (citing <u>Williams</u>).

> Under the "contrary to" clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than this Court has on a set of materially indistinguishable facts. Under the "unreasonable application" clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from this Court's decisions but unreasonably applies that principle to the facts of the prisoner's case.

<u>Williams v. Taylor</u>, 529 U.S. at 412-413, 120 S.Ct. at 1523; 535 U.S. at 694, 122 S.Ct. at 1850. *See also*, <u>Panetti v. Quarterman</u>, 551 U.S. 930, 953-954, 127 S.Ct. 2842, 2858-2859, 168 L.Ed.2d 662 (2007) (discussing the unreasonable application standard) (citing <u>Williams</u>, other citations omitted).

"Avoiding these pitfalls [described in <u>Williams v. Taylor</u>] does not require citation of our cases – indeed, it does not even require *awareness* of our cases, so long as neither the reasoning nor the result of the state-court decision contradicts them." <u>Early</u>

v. Packer, 537 U.S. 3, 8, 123 S.Ct. 362, 365, 154 L.Ed.2d 263 (2002) (emphasis in original).  Further, "whether a state court's decision was unreasonable must be assessed in light of the record the court had before it."  Holland v. Jackson, 542 U.S. 649, 652, 124 S.Ct. 2736, 2738, 159  L.Ed.2d 683 (2004).

The basic law governing ineffective assistance of counsel claims was clearly established in Strickland v. Washington, 466 U.S. 668, 690, 694, 104 S.Ct. 2052, 2066, 2068, 80 L.Ed.2d 674 (1984).  Williams, 529 U.S. at 405-406, 120 S.Ct. at 1519-1520; Bell, 535 U.S. at 694-695, 122 S.Ct. at 1850.  Under the two part test of Strickland, Petitioner must demonstrate both deficient performance and prejudice to the outcome.

To establish deficient performance, a petitioner "must identify the acts or omissions of counsel that are alleged not to have been the result of reasonable professional judgment."  466 U.S. at 690, 104 S.Ct. at 2066.  In reviewing the claim, "counsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment."  466 U.S. at 690, 104 S.Ct. at 2066.  "[B]ecause counsel's conduct is presumed reasonable, for a petitioner to show that the conduct was unreasonable, a petitioner must establish that no competent counsel would have taken the action that his counsel did take."  Chandler v. United States, 218 F.3d 1305, 1315 (11th Cir. 2000) (en banc), cert. denied, 531 U.S. 1204 (2001).  See also Fugate v. Head, 261 F.3d 1206, 1217 (11th Cir. 2001) (citing Chandler).  There are no rigid requirements or absolute duty to investigate a particular defense.  Fugate v. Head, 261 F.3d at 1217.

Indeed, "[c]onsidering the realities of the courtroom, more is not always better.  Stacking defenses can hurt a case.  Good advocacy requires

'winnowing out' some arguments, witnesses, evidence, and so on, to stress others."

*Id.*

For prejudice, Petitioner must show "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome."  466 U.S. at 694, 104 S.Ct. at 2068.

In the context of a guilty plea, the first part of the Strickland test is the same, but "in order to satisfy the 'prejudice' requirement, the defendant must show that there is a reasonable probability that, but for counsel's errors, he would not have pleaded guilty and would have insisted on going to trial."  Hill v. Lockhart, 474 U.S. 52, 59, 106 S.Ct. 366, 370, 88 L.Ed.2d 203 (1985); Gordon v. United States, 496 F.3d 1270, 1277 (11th Cir. 2007), *quoting*, Hill.  Where a claim of ineffectiveness is based on counsel's advice which allegedly resulted in rejection of a favorable plea offer, the petitioner "must show that there is a reasonable probability that, but for counsel's errors, he would . . . have pleaded guilty and would [not] have insisted on going to trial."  Coulter v. Herring, 60 F.3d 1499, 1504 and n. 7 (11th Cir. 1995), *cert. denied*, 516 U.S. 1122 (1996), *quoting* Hill v. Lockhart, 474 U.S. 52, 59, 106 S.Ct. 366, 370, 88 L.Ed.2d 203 (1985); Smith v. Singletary, 170 F.3d 1051, 1053 (11th Cir. 1999) (*quoting* Coulter).

The "prejudice" inquiry in the context of a guilty plea "will closely resemble the inquiry engaged in by courts reviewing ineffective-assistance challenges to convictions obtained through a trial."  Hill, 474 U.S. at 59, 106 S.Ct. at 370.  In other words, the question of whether a defendant would have insisted upon going to trial had attorney

error not occurred with respect to the guilty plea will turn in large part upon whether the

defendant might reasonably have achieved a more favorable outcome had he gone to

trial. United States v. Rosario, 902 F.2d 55, 58 (D.C. Cir.), *cert. denied*, 498 U.S. 942

(1990).

> For example, where the alleged error of counsel is a failure to investigate
> or discover potentially exculpatory evidence, the determination whether
> the error "prejudiced" the defendant by causing him to plead guilty rather
> than go to trial will depend on the likelihood that discovery of the evidence
> would have led counsel to change his recommendation as to the plea.
> This assessment, in turn, will depend in large part on a prediction whether
> the evidence likely would have changed the outcome of a trial. Similarly,
> where the alleged error of counsel is a failure to advise the defendant of a
> potential affirmative defense to the crime charged, the resolution of the
> "prejudice" inquiry will depend largely on whether the affirmative defense
> likely would have succeeded at trial. *See, e.g., Evans v. Meyer*, 742 F.2d
> 371, 375 (CA7 1984) ("It is inconceivable to us . . . that [the defendant]
> would have gone to trial on a defense of intoxication, or that if he had
> done so he either would have been acquitted or, if convicted, would
> nevertheless have been given a shorter sentence than he actually
> received").

Hill, 474 U.S. at 59, 106 S.Ct. at 370-371.

Although Strickland explained the performance and prejudice prongs of analysis,

"there is no reason . . . to approach the inquiry in the same order or even to address

both components of the inquiry if the defendant makes an insufficient showing on one."

466 U.S. at 697, 104 S.Ct. at 2069. "If it is easier to dispose of an ineffectiveness claim

on the ground of lack of sufficient prejudice, which we expect will often be so, that

course should be followed." *Id.*

A state court's adjudication of an ineffective assistance claim does not satisfy the

"contrary to" language of § 2254(d)(1) even if this court might have applied Strickland

differently. Williams, 529 U.S. at 406, 120 S.Ct. at 1520; Bell, 535 U.S. at 698, 122

S.Ct. at 1852.  To determine whether the state court's adjudication was an "unreasonable application" of <u>Strickland</u>, Petitioner "must do more than show that he would have satisfied *Strickland's* test if his claim were being analyzed in the first instance . . . .  Rather, he must show that the [state court] applied *Strickland* to the facts of his case in an objectively unreasonable manner."  <u>Bell</u>, 535 U.S. at 698-699, 122 S.Ct. at 1852 (*citing* <u>Williams</u>).  "[T]he most important point is that an *unreasonable* application of federal law is different from an *incorrect* application of federal law." <u>Williams v. Taylor</u>, 529 U.S. at 410, 120 S.Ct. at 1522.

**Evidence from the hearing**

Anthony Waylon Graham was Petitioner's attorney.  Doc. 82 (transcript of hearing), p. 8.  He has been a criminal defense lawyer since 1986.  *Id.*, p. 7.  He began his representation of Petitioner in February or March of 2002.  *Id.*, p. 8.

Graham testified that he conducted discovery and took depositions.  *Id.*, p. 9.  He recalled that the child victim and the child's mother "were fairly credible witnesses."  *Id.*, p. 10.

Graham said that from the beginning of the case, Petitioner "was telling me that the mother and the child were somewhat transients and he did not believe that they would remain in the area."  *Id.*, p. 10.  Petitioner felt like "we might be able to exploit that.  And eventually, I think they did leave the area, and we were able to exploit that." *Id.*  Graham said he "drug this out for a very long time, trying to exploit the fact . . . that these people may move away . . . ."  *Id.*, p. 11.  Graham said:  "And through every ethical means that I could muster, I delayed it [the trial] for as long as I could."  *Id.*, p. 12.  He said that there came a point when the prosecutor, Nancy O'Connor, announced

on the record that the victim and the mother had left the area and she felt she would have difficulty prosecuting the case. *Id.*, pp. 10-11. Graham said that O'Connor did not seem to be in a hurry to try the case, either. *Id.*, p. 12.

Graham said he first got the criminal complaint, and eventually the information[1] and the discovery. *Id.*, p. 13. He said generally "that's the way they do it." *Id.* He said that he usually gets discovery materials in four to ten weeks for a felony case. *Id.*, p. 16.

Graham said that it is his practice to give the discovery to the client, have the client read it, and then meet with the client to discuss it. *Id.*, p. 14. He wants the client to "get it on [his] mind" before he talks with him. *Id.*

Graham said that Petitioner was a "considerate" client, and not a high maintenance client. *Id.*, pp. 14-15. Graham knew Petitioner and knew him to be intelligent. *Id.*, p. 15.

Graham said that Petitioner's defense was that the offense did not happen. *Id.*, p. 17. He said that Petitioner said that he was "with the child, and I guess you could say he had the opportunity, but . . . this did not happen and I did not touch the child inappropriately." *Id.*, p. 17.

Graham said that Petitioner had been convicted of a prior sex charge ("lewd and lascivious") for which he did prison time, and he thought that the prior conviction possibly subjected Petitioner to the risk of similar fact evidence at trial. *Id.*, p. 18.

---

[1] As will be seen ahead, he did not get the information until the day of the plea.

Graham said that Petitioner also might have been subjected to enhanced sentencing

under the Prison Releasee Reoffender Act.  *Id.*

Graham said that Petitioner made it clear to him that:

he was not going to enter a plea to anything that included any type of jail
time or prison time.  He insisted that these people would not [be] available
for trial, and if I could just push it to trial, at some point, he felt like they
would be gone and I would have the prosecutor over a barrel.  And
eventually, that's exactly what happened.  And as the case went on,
Nancy [O'Connor] became more and more reasonable, and her offers got
a [little] better and a little better until the very end when we got to the point
where he was able to get a probation sentence.

*Id.*, p. l9.  Graham said that initially, the prosecutor threatened that she would seek

sentencing as a Prison Releasee Reoffender and ask for the maximum sentence, but

she would agree to 15 years.  *Id.*, p. 20.

With respect to this last assertion, the prosecutor sent Graham a letter dated

June 4, 2002, stating that she would seek sentencing of Petitioner as a Prison Releasee

Reoffender and that she would ask for the maximum sentence.  *Id.*, pp. 20-21 and R.

Ex. 1.  On June 5, 2002, she sent to Graham a notice of Prison Releasee Reoffender

status.  *Id.*, pp. 21-22 and R. Ex. 2.

On February 19, 2003, the prosecutor sent to Graham an offer of a prison

sentence for 31.04 months.  *Id.*, pp. 22-24 and P. Ex. 1.  Graham said that sometimes

he and the prosecutor talked over the telephone about other plea options, "but those

were not memorialized."  *Id.*, p. 24.

Graham said that he and Petitioner would talk about these plea offers, "and it

always ended the same way.  I mean, Jerry made it crystal clear to me, he would not

want to take any deal that required him to do any jail time, period." *Id.*, p. 24. Graham

said:

> I mean, whenever this [a plea offer] would come up, I would meet with Mr.
> Nichols. Some of the stuff, I did not become bogged down in because Mr.
> Nichols didn't care what they had or what she said, he was not going to
> enter a plea to anything that required him to do a single day in jail. So the
> conversations with him were always simple, if the [deal] involved jail time,
> he made it clear, I'm not going to do the deal.

*Id.*, p. 25.

Graham said that it is his practice to read letters making plea offers, put them in

the file, and talk with his client about them. *Id.*, p. 26. He said: "A lot of times . . . the

clients and I don't waste a lot of time with them because there's an absurd offer." *Id.*

He said he notifies his clients of a plea offer orally, and "a lot of times, it's just a quick

phone call, because I know what their answer is going to be." *Id.* Graham does not

keep any kind of records of these telephone calls. *Id.*, pp. 26-27. He said he charges a

flat fee to his clients, and does not keep records of all telephone calls he makes

throughout the day. *Id.*, p. 27. He has no procedure or means to record what he says

in a telephone call. *Id.* He occasionally writes a letter to a client, but is "not a big letter

writer." *Id.* He said: "I tend to like to talk to clients face to face." *Id.* He had no written

evidence to show that he conveyed any of the plea offers to Petitioner. *Id.*, p. 33.

Graham said that at times, he will send discovery to a client with a cover letter.

*Id.*, p. 28. Sometimes, though, he does not do a cover letter, and clients come in to his

office to pick up discovery. *Id.* He had no letter to Petitioner showing that he sent

discovery to him. *Id.* Indeed, Graham admitted that he had no letters at all in his file

that he sent to Petitioner. *Id.* Petitioner was out on bond prior to trial. *Id.*, p. 34.

Graham said he orally responded to the June 4, 2002, plea offer, telling the prosecutor that "we weren't going to do that deal." *Id.*, p. 29. He did not write a letter to the prosecutor rejecting the plea offer. *Id.* Graham said he did not send any written response to any of the three plea offers, but he insisted that he orally told the prosecutor that Petitioner would not accept the first two offers. *Id.*, pp. 33, 35. He must have talked to the prosecutor about the third offer, however, because that offer was accepted by Petitioner.

Graham said he talked with Petitioner about these plea offers. *Id.*, p. 34. He said he "would have" talked with Petitioner about each plea offer "shortly after I received it." *Id.* He said: "Again, I knew what his answer was going to be. And every time I would bring this up, he would cut me off. If it was jail time, he was not going to do it." *Id.*, p. 34. Graham repeated: "My recollection is that Jerry Nichols' resolve never cracked. He would not entertain the notion of entering any plea to any charge that required him to do one day in jail." *Id.*, p. 41.

Graham said that depositions had been taken by June 4, 2002. *Id.* Graham first said that he had no evidence that he had deposed Tamberly Jean Nichols[2] or had taken a statement from her. *Id.*, p. 30. He had her address in discovery. *Id.* Upon further review of his file, Graham said he did have a copy of a deposition of Tamberly Jean Nichols, taken by the prosecution. *Id.*, pp. 31-32. Graham said he had no idea whether he discussed this deposition with Petitioner, or whether it made any difference in his analysis of the case. *Id.*, p. 32. A copy of this deposition is P. Ex. 2. *Id.*, p. 33.

---

[2] The evidence from Tamberly Jean Nichols will be discussed ahead.

Graham said that the February 19, 2003, plea offer was an offer to plead to a third degree felony and receive a sentence of 31.04 months in prison, "with the balance on probation." *Id.*, p. 37. Since a third degree felony is a five year felony, the "balance" on probation, he said, was about 2 years 5 months. *Id.* He said that he told Petitioner about this offer shortly after he received the offer, but Graham had no record of that and he could not recall when or where he talked to Petitioner. *Id.* , p. 38. He then said that he had no recollection of having talked with Petitioner about the February 19th plea offer. *Id.*, p. 41.

Graham was asked whether he knew the specific charge against Petitioner for the February 19th plea offer and he said no. *Id.*, p. 41. He was asked whether he had anything in writing in his file to indicate precisely what the charge was as the basis for the February 19th plea offer, and he said no. *Id.*, p. 42. He had had the opportunity to look through his file. *Id.*, p. 43.

Graham said that the State had the power to amend the charge "right up until the time we pick the Jury." *Id.*, p. 43. He said "we knew what the basic outline of the charge was, it was lewd and lascivious." *Id.* He said that "there's all kind of intricacies to that particular charge and they can amend the information anywhere [along] the way." *Id.*, p. 45. He said: "They could have charged it as a second degree or a third degree, there's all kinds of options they had available to them." *Id.*

Graham understood from the February 19th plea offer that the State would accept a plea to a third degree felony if Petitioner would accept a 31.05 months prison

sentence. *Id.*, p. 45. Graham said: "I would have talked to him about this offer."[3] *Id.* He said he would not have told the prosecutor "no" to the offer without talking to Petitioner. *Id.* He repeated that he had nothing in writing to evidence this, that he just "talked to her [the prosecutor] on the phone." *Id.*, p. 46. He said that the conversation on this topic was "always simple, he's not going to plead to anything that requires him to do any jail time." *Id.* Graham said that the prosecutor "was insistent that he go to prison," but since Petitioner did not want to accept any offer requiring that he go to prison, the fact that this plea offer was based on a third degree felony charge was not important. *Id.* and p. 51. He reiterated that "the focal point was jail or prison time," not the degree of the felony charge. *Id.*, p. 52.

Graham also said that because Petitioner said he would not go to prison, he did not discuss the guidelines score sheet with Petitioner. *Id.*, p. 47. He did not know whether Petitioner should have qualified for a guideline probationary sentence had he accepted the February 19th plea offer. *Id.*, p. 49. He had no guidelines score sheet in his file other than the one prepared by the prosecutor. *Id.*, p. 50. When asked whether it would have been proper to have prepared an alternative guidelines score sheet, Graham repeated that the prosecutor wanted Petitioner to go to prison. *Id.*, p. 49.

Graham said that he and Petitioner had the information on February 19, 2003, and then said he did not recall. *Id.*, p. 43. Graham reasoned that by February 19, 2003, there "would have to have been an information that was already filed at that date

---

[3] It is recognized that this testimony is redundant, but it is reported here in the interests of completeness.

because the case was a year old." *Id.*, p. 44. He said "It would have been in the

Courthouse official records at the Bay County Courthouse." *Id.*

Graham said that even though it had become difficult to get the child and her

mother to return to the jurisdiction to testify, he knew that the prosecutor had

procedures which she could use to force them to return to testify. *Id.*, p. 54. He said:

> The problem is you don't ever know if that's how it's going to play out. At
> some point the State may buck and bow up and then try to get the witness
> there, and then the deal is off the table.

*Id.* He said that the prosecutor had told him throughout the year that she planned to

make the child testify regardless of what her mother wanted. *Id.*, pp. 54-55.

Graham said that he and Petitioner discussed the "ramifications" if Petitioner

violated probation. *Id.*, p. 55. He said that Circuit Judge Overstreet "made it clear to

him what was going to happen if he violated [the terms of probation]." *Id.* Graham

knew that Petitioner had prior experience with the criminal justice system. *Id.*

Graham said that he and Petitioner had talked about the case as being a

"swearing contest." *Id.*, p. 57. Graham was shown Petitioner's Exhibit 3, the

information, which alleged that Petitioner "attempted to handle, fondle or make an

assault upon the child by attempting to touch her vagina." *Id.*, p. 59. Graham could not

recall what the child had said about the "attempt." *Id.*

Graham said that at the plea colloquy, he was more concerned about "what the

ultimate deal was," and not whether "the information was perfect or not." *Id.*, p. 60. He

said:

> There's a time to nitpick on the State's information, and there's a time not
> to. Here, we had a deal that kept him from going to jail or prison, and we
> were not nitpicking on the information.

*Id.*, p. 61.

Graham said he "certainly did not" know at the time of the plea that "there was a probability that the State would pursue a violation, if possible." *Id.*, p. 61. He said that he always explains to his clients "that when you're on probation, you've got one shoe on a banana peel and the [other in] the DOC [Department of Corrections]." *Id.* Graham knew that if Petitioner violated probation, he was subjected to the statutory maximum prison term of 15 years. *Id.*, p. 62.

Graham said that he thought that the final plea offer, the one that Petitioner accepted, included a provision that if he complied with the terms of probation, probation could be terminated early after five years. *Id.*, p. 70. Graham said that the final plea offer, a probationary sentence for someone with a prior conviction, was "an excellent deal, especially with this particular Judge." *Id.*, p. 70.

Graham had the guidelines score sheet relating to that third plea offer (dated March 7, 2003) in his file. *Id.*, p. 76. He also had a score sheet dated April 7, 2003, in his file. *Id.*, p. 78. Neither scoresheet reflects the way the prosecutor developed the earlier plea offer, on February 19, 2003.

The prosecutor, Nancy O'Connor, testified that she had no independent recollection whether she filed an information against Petitioner on the day of the plea. *Id.*, p. 82. She said that Judge Overstreet "was rather particular about informations being filed early on." *Id.*, p. 83. It was her practice, however, to file an information "to fit whatever the plea agreement was." *Id.*

O'Connor said that when she was assigned the case, "I had intended that [Petitioner], if he pled, would be going to the Department of Corrections." *Id.* She had

no independent recollection of sending plea offers to Graham. *Id.* She said that guidelines score sheets were done by someone in her office, and if a scoresheet was available, it was her custom to send it with the plea offer. *Id.*, p. 84. She was shown the February 19, 2003, plea offer with the attached score sheet and said that it appeared that her plea offer was consistent with the guideline sentence reflected on the score sheet. *Id.* and p. 85.

O'Connor could not recall whether Graham had talked with her about whether the score sheet attached to the February 19th offer was correct. *Id.*, p. 85. O'Connor said that Graham was normally "very prompt in getting back to me about the cases that we were working on." *Id.* She that since the score sheet attached to the February 19th plea offer reflected a third degree felony charge, and assuming that she had not yet filed an information, had that plea offer been accepted, she would have filed an information charging a third degree felony consistent with the offer. *Id.*, p. 86. She said that had Graham shown her an error in the score sheet, she would have taken it back and reconsidered it. *Id.*, p. 87. O'Connor said, however, that "because of my knowledge of the Defendant, I would not intend to go back and lower the score sheet from what I had set out, the 31.5 [months]." *Id.*

O'Connor said that she eventually did lower her offer. *Id.*, p. 87. She explained that the time of trial was approaching, "my victim, the little girl, and her mother had moved to Pennsylvania." *Id.*, p. 88. O'Connor said:

> The mother was very reluctant to pursue the case because she didn't want her daughter to testify. When she moved to Pennsylvania, I spoke to her on the telephone and she made it very clear to me that she was not going to come back to Florida, and that is the reason why it [the plea offer] changed.

*Id.* She acknowledged that on the day of the plea, March 7, 2003, she told the court that she was probably not able to prosecute the case because of the difficulty with the victim being in Pennsylvania. *Id.*, pp. 88-89. She said this to explain to the court the background of the plea offer. *Id.*, p. 89. O'Connor said that she did not know if she had filed the information on March 7, 2003, but she said that if she did, that was "not all that unusual," because "things change pretty quickly." *Id.*, p. 91.

O'Connor was shown Respondent's Exhibit 1, the first plea offer dated June 4, 2002. *Id.*, p. 92. The offer was a plea for a prison term of 15 years as a prison releasee reoffender and designation as a sexual predator. *Id.*, p. 93. This was an offer for a plea to a second degree felony. *Id.* She was shown Respondent's Exhibit 2, which was her notice to Petitioner of prison releasee reoffender status. *Id.* O'Connor said that to file this, she had to have had the belief that Petitioner had been in prison within the last three years. *Id.*, p. 94.

O'Connor was shown Petitioner's Exhibit 1, the February 19, 2003, plea offer. *Id.*, p. 95. This was the offer for a prison term of 31.05 months, with the balance on probation. *Id.* Since it was a plea to a third degree (five years in prison) felony, the balance would have been about 29 months. *Id.* O'Connor said that, had the February 19th plea offer been accepted, she would have filed an information charging lewd and lascivious conduct pursuant to FLA. STAT. § 800.04(6).[4] *Id.*, p. 103.

Petitioner Jerry Lee Nichols testified that he has a bachelor's degree in engineering technology. *Id.*, p. 122. Nichols said that he did not see the information in

---

[4] See Court's Exhibit 2 (copy of FLA. STAT. § 800.04 (1999)).

this case until after he was in jail for violation of probation, after he had entered his plea and was sentenced. *Id.*, p. 106. He said he never reviewed the information with Mr. Graham. *Id*. During the plea colloquy, Graham said that the information was being filed at the time of the plea, and Nichols had no idea what was in it. *Id*.

Nichols said that about three or four months after Graham took over the case, he "said he thought that they might take 10 years in prison and what did I think about it. I said absolutely, no, I would never go to prison for 10 years." *Id.*, p. 107. Nichols testified that Graham did not tell him that this was an offer at that point. *Id*.

Nichols was shown Petitioner's Exhibit 1, the February 19, 2003, plea offer. *Id.*, p. 107. He said that he did not become aware of this second plea offer until after he had been in prison on the violation of probation for over two years. *Id*. He said he did not see the plea offer until Graham sent him a copy of Graham's file in June, 2005, when Nichols was preparing his state Rule 3.850 motion. *Id.*, pp. 107-108. He testified that the mailing envelope, that was taped to a larger envelope containing the February 19th plea offer, is Petitioner's Exhibit 7. *Id.*, p.108. That envelope is addressed to Nichols in state prison and has a postage label dated May 5, 2005. P. Ex. 7. The letter requesting these records is also attached to Petitioner's Exhibit 7. *Id.*, p. 111.

Petitioner testified that he:

[A]bsolutely would have taken this offer as opposed to what was entered, yes, ma'am. And the reason for that is because I was not aware, at all, that I was putting myself at risk of going 10 years longer if I violated as opposed to going to prison for two and a half years.

*Id.*, pp. 111-112.

He said that the reason he would not have exposed himself to another 10 years in prison for violating probation is that "it happened to me before." *Id.*, p. 112. He referred to his own case decided by the Florida First District Court of Appeal. *Id.* In that case, his sentence for violation of probation was reversed. *Id.* Nichols said that he learned from this case that one did not have to willfully violate probation to be sent to prison. *Id.* He said that he had entered a plea in the earlier case, with adjudication withheld, and was sentenced to 36 months on probation. *Id.*, p. 119. His probation was revoked in the 33rd month because he had not done "work hours that my probation officer told me I could pay for." *Id.* He spent 14 months in prison before he was released after the successful appeal.[5] *Id.*

Nichols said that he entered his plea to the second degree felony, for a sentence of probation, because he did not know he had any other choice. *Id.*, p. 116. He said that Graham called him up the day before and said "we're going to enter a plea tomorrow for probation. That's basically the extent of our conversation." *Id.*, p. 117. Nichols testified:

> He told me nothing about the charge, degree or nothing, with the exception of, he said that I would be pleading to a lesser offense that Ms. O'Connor had wanted to charge me. And that by pleading to a lesser offense, I would not be a sexual predator.

*Id.*

---

[5] The case is <u>Nichols v. State</u>, 747 So. 2d 1015 (Fla. 1st DCA 1999). Petitioner's Exhibit 8. The court found that the probation officer had never directed Petitioner to serve community service hours, and told him that she would ask the court to let him "pay off" the hours instead of working. 747 So. 2d at 1016. The court held that this evidence did not show a "willful" violation of probation. *Id.*

Nichols said he did not learn that he would be designated as a sexual predator until the plea agreement was presented to the judge. *Id.*, p. 117. He then asked Graham "can they do that," and Graham said "yes," "but don't worry, it doesn't matter because there's no difference between the designations anyway." *Id.* He since has learned that there is a "big difference." *Id.*, p. 118.

Nichols said that before he was sentenced for violating probation in the case at bar, he had objections to the guidelines score sheet and told Graham about those objections. *Id.*, p. 113. Graham argued the objections at sentencing. *Id.* The state prosecutor then agreed to the corrections.[6] *Id.*, pp. 113-114. Nichols said that this was the first time that he had had the opportunity to discuss a guidelines score sheet with Graham. *Id.*. p. 116.

Nichols said that he would have preferred to have entered a guilty plea to the February 19th offer with the correction to the score sheet that was made when he violated probation, but if that had not been possible, he still would have preferred the 31 month prison sentence to a third degree felony rather than probation to a second degree felony. *Id.*, p. 118.

Nichols said that "from day one," he had maintained his innocence to Graham. *Id.*, p. 121. He said that he "scared the child," and Graham told him "that would constitute an attempt because of my prior charge and they would be able to prove an attempt because I had scared her." *Id.*

---

[6] The new prosecutor was Mark Graham, no relation to Petitioner's attorney.

The following is a summary of the evidence from the exhibits. Respondent's Exhibit 1 is a letter from O'Connor to Graham dated June 4, 2002. *Id*. The plea offer was for Petitioner to plead "as charged" and to be sentenced to a 15 year prison term as a Prison Releasee Reoffender and designation as a sexual predator. *Id*. O'Connor said: "As you can see from the scoresheet, he could be sentenced up to 35 years." *Id*. No score sheet is attached. O'Connor warned that she had evidence of an earlier incident "involving the same activity which very well could be used for similar fact evidence; the victim and witnesses in that incident are available and willing to testify." *Id*. The offer was open only until June 12th, O'Connor was ready to proceed to trial at the end of June, and O'Connor said that she would "be seeking the maximum sentenced under the guidelines." *Id*.

Respondent's Exhibit 2 is a "Notice of Prison Releasee Reoffender Status" dated June 5, 2002. The Notice warned that if Petitioner was found to have that status, he would not be sentenced under the guidelines. *Id*.

Petitioner's Exhibit 1, the February 19, 2003, plea offer, has been discussed above. It was titled "Charging Decision and Sentence," and offered a plea agreement to "attempted lewd and lascivious in the presence of a child," a 31.05 month prison sentence, and "the balance" on probation, with the other terms left to the court. The guidelines score sheet attached to the written plea offer marked the offense as a third degree felony, but left the statute as § 800.04(5)(B). *Id*. It deleted 40 points from a previous version for "sexual cont[act]," and thus proceeded on the theory that there had not been sexual contact. *Id*. The maximum sentence was 5 years, and the lowest possible prison sentence was 31.05 months. *Id*.

Respondent's Exhibit 3 is a sentencing guidelines scoresheet dated March 7,

2003, the date of the plea and sentencing.  While no witness so testified, counsel for

Respondent represented that this was the score sheet for sentencing after the March

7th plea, and counsel for Petitioner had no objection to that representation.  Doc. 82, p.

66.  The score sheet reflects that the charge is a second degree felony, an attempted

"L/L MOLEST V" less than 12 years of age, and the statute is still § 800.04(5)(B).  *Id.*

On this version, 40 points are again subtracted for "sexual contact."  *Id.*  The total

sentencing points were 107.4.  *Id.*  The maximum sentence was 15 years.  *Id.*  The

"total sentence imposed" is 1 year on community control and 8 years on probation.  *Id.*

This reflects a "mitigated departure," with this handwritten explanation: "request of

victim's mother – does not want child to testify."  *Id.*  It bears the Judge's signature.  *Id.*

Also included in this Exhibit is a score sheet dated April 7, 2003, the date of sentencing

after Petitioner violated probation.  The points are 113.4, after sanctions for violation of

release are added.  *Id.*  The lowest permissible sentence is 64 months, and the

maximum is 20 years.  The total sentence imposed is 15 years, and it has the Judge's

signature.  *Id.*

The information filed at the time of the plea alleged that Petitioner:

[B]etween the dates of October 31, 2001 through November 30, 2001,
2002 [sic], in the County and State aforesaid, did unlawfully attempt to
handle, fondle or make an assault upon a child under the age of sixteen
(16) years, to-wit: [child's name omitted here], age 11 years, in a lewd,
lascivious, or indecent manner, by attempting to touch the child on her
vagina, in violation of Sections 800.04 and 777.04, Florida Statutes.

Petitioner's Exhibit 3.

Petitioner's Exhibit 4 is the transcript of the plea colloquy and sentencing on March 7, 2003. At the plea colloquy, Petitioner's attorney said Ms. O'Connor was filing the information "as we speak." *Id.*, p. 2. Graham said that "the charge is going to be attempted lewd and lascivious on a child, a second-degree misdemeanor." *Id.* He said that Petitioner would enter a no contest plea to that charge for a sentence of community control II with a GPS device for one year, followed by eight years of probation, designation as a sexual offender, with the ability to terminate probation in 5 years if there were no violations. *Id.* Graham handed the Court the signed plea agreement. *Id.* The court said: "You may have misspoke when you said it was a second-degree misdemeanor." *Id.*, p. 3. Counsel said: "I'm sorry. Second-degree felony." *Id.* Counsel then explained that:

> because this is such a serious charge, Judge, Mr. Nichols was given a copy of that plea, proposed Plea-Waiver late yesterday afternoon. He took it home with him and read it and we discussed it this morning. I wanted you to know that, that he's had a lot of time to look at that.

*Id.* Counsel did not say that he gave Petitioner a copy of the information, and there is no evidence in the transcript of the plea colloquy to show that Petitioner had a copy of the information prior to entering his plea. *Id.*

O'Connor then said she wished to put the following on the record:

> I spoke at length with the victim's mother yesterday and I've talked to her previously within the last couple of weeks. The child is now living in Pennsylvania with relatives and the mother feels very strongly that she does not want the child to have to come down to Florida to testify. The child still has quite a bit of emotional difficulties stemming from this and it was her desire and I discussed the plea agreement with her and she is in agreement with it even though it is a departure sentence.

*Id.*, p. 3.

The court and the parties discussed the fact that Petitioner had a prior conviction dated March 4, 1996, for "lewd and lascivious" pursuant to the same statute, FLA. STAT. § 800.04. *Id.*, p. 4. Since the two convictions were within the prior ten years of each other, Graham agreed that Petitioner had to be designated a "sexual predator" instead of a "sexual offender" as first represented. *Id.*, pp. 4-5.

Petitioner was sworn as a witness. *Id.*, p. 5. The court advised Petitioner that he was charged with "attempted lewd and lascivious act on a child. That's a second-degree felony in Florida, punishable by 15 years in prison." *Id.*, p. 6. The court asked if it was Petitioner's understanding that he would enter a no contest plea to that charge "provided I sentence you in the fashion that he just announced," and Petitioner said: "Yes, sir." *Id.*

Petitioner said he understood that by pleading guilty he lost his right to a jury trial and he said that no one had forced him to accept the plea. *Id.* He said he had had an adequate time to talk with his lawyer and did not need to ask his lawyer any questions. *Id.*, pp. 6-7. The court said: "Do you understand that if you violate the terms of your supervision you're looking at 15 years in prison?" and Petitioner said: "Yes, sir." *Id.*, p. 7. Petitioner said he understood all of the conditions that would be imposed upon him as a sexual predator. *Id.* Petitioner said that he read the Plea, Waiver and Consent Form and he signed it. *Id.* He said that he understood it. *Id.* He said he did not have any questions about it. *Id.*, p. 8. Defense counsel was then asked: "Counsel, [do] you stipulate the state can prove your client is guilty of these charges for purposes of the plea," and counsel answered yes. *Id.*

The court adjudicated Petitioner guilty and imposed the agreed upon sentence, 1 year on community control, and 8 years on probation, and designated Petitioner a sexual predator. *Id.* The court said that this sentence was a "departure from the guidelines and this is as a result of an uncoerced plea bargain. At the request of the victim's mother the child does not want to testify." *Id.*, p. 9. The court noted that pursuant to the plea agreement, Petitioner could terminate supervision early after five years if no violations had occurred. *Id.*, p. 10. The court then warned:

> If you come back here on a violation and it's determined that you willfully violated your supervision after a court proceeding I will sentence you to prison for as long as I can.

*Id.*, pp. 10-11. Petitioner said: "Yes, sir." *Id.*, p. 11. The court said: "There will be nothing less than the maximum sentence for you," and Petitioner said "I understand." *Id.*

The evidence that Petitioner and the prosecution would have been considering as the plea agreement was being negotiated is the following. The child victim was deposed on May 6, 2002. She testified that she was then 11 years old. Respondent's Exhibit 4, p. 3. She and her mother did not have a place to stay in Panama City, she said, and Petitioner offered to let them stay with him. *Id.*, p. 5. They moved in shortly before Thanksgiving, 2001. *Id.*, p. 6. She said that at school, there was a DARE[7] box into which a child could put a note if the child wanted to tell something to the police officer at school. *Id.*, pp. 7-8. She said she put three notes in the box saying that somebody was doing something bad to her. *Id.*, p. 8. She did this about two months or

---

[7] DARE stands for Drug Abuse Resistance Education. See: http://www.dare.com/home/about_dare.asp

so after it had happened. *Id.*, p. 25. She said that the "bad things" had happened to her before she put the first note in the box. *Id.*, p. 10. She said she put the notes in the box because "he" was really starting to bother her. *Id.*, pp. 8-9. The officer tried to find out who wrote the notes in class, and she was reluctant to identify herself. *Id.*, p. 9. She then wrote the third note asking to meet with him. *Id.*

 The child victim said that "about a week" after she and her mother had moved in with Nichols, "something bad happened" with Nichols. *Id.*, p. 12. She said she fell asleep on the couch, and awoke to find Nichols "touching me in the wrong places." *Id.*, pp. 12-13. She tried to pull her legs up, but Nichols "would just pull them back out." *Id.*, p. 13. It was dark, she said. *Id.* She said that she thought that her mother was then at work, but actually she was at home, sick. *Id.*, pp. 13-14. She said that she and her mother shared a bedroom. *Id.*, p. 14. She said that Nichols was trying to touch her "chest area," her "breast area," and her "private area." *Id.*, pp. 15-16. She had a shirt on. *Id.*, p. 16. Nichols touched her on top and under her shirt on her "breast area." *Id.*, pp. 16-17. She said that Nichols touched the area "between her legs" both on top of her pants and underneath her pants. *Id.*, p. 18. She tried to draw her legs up in a ball to make him stop. *Id.* That did not work, and Nichols would "just pull them back out." *Id.*, p. 19. When he tried to touch her again, she said: "I pulled myself back up and I said that I had to use the bathroom." *Id.* Instead of going to the bathroom, she then ran upstairs to the bedroom. *Id.* She was "happy" that her mother was there, and she immediately told her what Nichols had done. *Id.*, p. 20. Her mother kept her in the bed with her that night, holding her. *Id.* Her mother was still "pretty sick" with the flu or something else. *Id.*, p. 21. She said that her mother did not have the strength to

confront Nichols then. *Id.* After that night, she stayed away from Nichols. *Id.*, p. 22.

Except for trying once to grab the child victim's arm on another occasion, there were no

more "bad incidents" with Nichols. *Id.*, p. 23. She said that about a month later, she

and her mother moved out of Petitioner's residence. *Id.*, p. 24.

The victim's mother was deposed on May 6, 2002. Respondent's Exhibit 5. She

said that she and her daughter were introduced to Nichols and he said they could share

his apartment. *Id.*, pp. 4-6. The apartment had two bedrooms and two bathrooms. *Id.*,

p. 6. The mother further explained that she had met a woman named Stephanie at her

work (Domino's Pizza) and Stephanie said that she had known Nichols since she was 8

years old. *Id.*, p. 4. She made the introduction to Nichols. *Id.* The mother was not

dating Petitioner. *Id.*, p. 5. She said that she and her daughter were in a financial bind,

had no other place to go, and did not pay rent. *Id.*, p. 6. She said that she was sick on

the night of incident, and her daughter "came running up the stairs, I mean, hysterical.

She was crying, you know, real hard. And she told me what happened, you know, that

he had – that she woke up to him touching her, you know, underneath her clothes and

stuff." *Id.*, p. 7. Her mother said she had never seen her daughter that upset "in my

life." *Id.*, p. 8. She did not confront Nichols because she was afraid he would kick them

out. *Id.*, p. 10. The mother further said that Stephanie had told her not to leave her

daughter with Nichols, and said she had heard that he had touched a young girl. *Id.*, p.

9. It was not clear when this touching incident occurred.

Petitioner's niece, Tamberly Jean Nichols, was deposed on August 6, 2002.

Petitioner's Exhibit 2. She said that she and her daughter lived with Nichols in his

apartment from October to December, 2001. *Id.*, pp. 5, 7. She said that at first it was

just her and Petitioner, and then a mother and daughter moved in because they needed a place to stay. *Id.*, p. 6. She said that on one particular evening, she and Nichols went to a restaurant. *Id.*, p. 10. The mother and girl stayed in the apartment. *Id.* When they got home, the mother had gone upstairs to sleep and the child was asleep on the couch. *Id.* She said that she and Petitioner had returned at 9:00 p.m. and "it was getting obviously very late." *Id.* Petitioner's niece said that she sat in a rocking chair in the living room with her infant daughter. *Id.*, p. 9. She explained:

> And, you know, we had given our bedroom upstairs to them and moved all of our stuff out and put it in storage, so that they could have the upstairs bedroom because we were taking the downstairs and the couch in the living room with the CDL [sic].

*Id.* She said that Nichols woke up the child on the couch by tapping her on the shoulder, and then placing his hands under her arms to help her stand up to go upstairs to bed. *Id.*, pp. 9-10. *Id.*, p. 10. Petitioner's niece said that the child "was kind of groggy and she just appeared that, you know, maybe it was a new place, and maybe the surroundings, she just didn't recognize, and she did appear startled, you know." *Id.*, p. 11. Tamberly Nichols said that the child said nothing to her or to Nichols. *Id.* Ms. Nichols said:

> She kind of looked around and she looked up at him like, I mean I guess like she didn't, she just didn't look like she even, maybe didn't even recognize where she was. And she did say that she had to go to the restroom, to the bathroom, and then she went upstairs.

*Id.*

The full transcript of sentencing for violation of community control is Petitioner's exhibit 9.[8]  The hearing began with a discussion of whether the information had charged a second or a third degree felony.  *Id.*, pp. 3-4.  Graham contended that 5 years was the maximum prison term because the information charged a third degree felony.  *Id.*, p. 4. The court rejected the argument, finding that Petitioner knowingly entered a plea to a second degree felony.  *Id.*, pp. 5-8.  The prosecutor agreed to correct some portions of the guideline score sheet, subject to the right to "respond," and the court sentenced Petitioner to a term of 15 years.  *Id.*, pp. 9-10.

Petitioner appealed the violation of community control judgment and sentence of 15 years.  Petitioner's statement of facts explains that he was charged with three violations of community control.  The first was that on March 7, 2003, Petitioner denied knowledge of a social security number, but on March 12, 2003, he admitted he had altered the social security number.  Doc. 13-3 (brief on appeal), p. 4 (p. 11 in ECF).  The second alleged violation was that on March 12, 2003, Petitioner failed to follow instructions in that he failed to have his cellphone with him at all times.  *Id.*  The third violation was that on March 12, 2003, Petitioner failed to comply with rules of community controls in that he was instructed to respond immediately to all messages sent to his portable transmitting device, and on March 7, 2003, he failed to do so.  *Id.*, pp. 4-5 (pp. 11-12 in ECF).

The brief on appeal further states that the probation officer testified that he had received information from another person "about a false driver's license and false Social

_____

[8] Petitioner's Exhibit 5 purports to be the same transcript, but page 9 is from the original departure sentencing on March 7, 2003.

Security card given to Nichol's landlord." *Id.*, p. 5 (p. 12 in ECF). Another probation officer testified that on March 7, 2003, he asked Nichols "about a second Social Security card and second driver's license number, and that Nichols 'denied any knowledge' of them." *Id.*, p. 7 (p. 14 in ECF). He further testified that on March 12, 2003, "Nichols admitted to altering his existing driver's license and Social Security cards, but also that he did not know when or where he had used these altered documents." *Id.*

The evidence concerning the cellphone was that the probation officer tried to call Nichols on his cellphone on March 12, 2003, and it was "no longer in service." *Id.*, p. 6 (p. 13 in ECF). It was unknown by the officer whether this was because Nichols had not purchased enough minutes or whether the minutes had expired. *Id.*

The evidence concerning the portable transmitting device was that the probation officer sent a message to the device at 8:20 a.m. on March 12, 2003, but Nichols did not immediately respond as instructed. *Id.*, p. 6 (p. 13 in ECF). The officer went to the residence of Nichols and heard the device "beeping in Nichols' kitchen," and it appeared that Petitioner was sleeping. *Id.*

**Findings of Fact**

I find as established fact that Petitioner repeatedly told Graham that he would not accept any plea agreement that required that he do jail or prison time. He did not retreat from this position and he unwaveringly insisted that he was innocent. Graham's testimony as to these points was credible and is corroborated by other evidence. Petitioner admitted that he told Graham he would not go to prison for 10 years as a part of a plea. He admitted that he told Graham "from day one" that he was innocent. There was some evidence of innocence. Petitioner's niece, Tamberly Nichols, would testify

that she was present and did not see Petitioner improperly touch the child. Moreover, it is well established that the child and her mother were reluctant to testify. Thus, all along there was a good possibility that they might move away and become unavailable to the prosecutor if the case was delayed without resolution. All of this supports the conclusion that Petitioner refused to accept any plea offer that required that he go to prison. He did this because he insisted that he was innocent. He also did this because his trial strategy was to delay, hoping that the prosecution's witnesses would become unavailable.

I further find as fact that Graham orally communicated every plea offer to Petitioner, including the February 19, 2003, offer to plead to a third degree misdemeanor with a 31 month prison sentence. I make this finding of fact without the kind of evidence one would expect from an organized practicing lawyer. Graham did not send a copy of any written plea offer to Petitioner, including the February 19th plea offer. Graham has no records of doing so. Graham keeps no paper records of his actions in the defense of his client at all, with the exception of court filings. Still, I reject as not credible Petitioner's testimony that Graham did not orally convey each plea offer to Petitioner when it was made, and that he did not convey Petitioner's response back to O'Connor. Graham so testified. Despite his lack of written records, Graham seemed to have had a thorough understanding of his defense of Petitioner. He recognized, as did Petitioner, that delay would be advantageous since the witnesses, with delay, might become unavailable. That strategy was aimed at obtaining a plea agreement or obtaining a dismissal of charges due to the unavailability of the critical witnesses. It was not focused upon going to trial. Therefore, each plea offer made by O'Connor was of

critical importance to Graham. I do not believe that he failed to tell Petitioner of the contents of the February 19th plea offer.

I also make this finding based upon the very credible testimony of O'Connor. O'Connor testified that Graham was very good at "getting back" to her in criminal cases. O'Connor wanted Petitioner to go to prison. But she had a case that was eroding as time went by. She made three plea offers. Each plea offer made it to Graham, and the question is whether the offers made it to Petitioner. The first was for a 15 year prison sentence and a 15 year felony (second degree). O'Connor would not have made the February 19, 2003, plea offer for a sentence of 31 months to a 5 year felony (third degree) absent a firm rejection from Graham of the June, 2002, plea offer. She would not have made the March 7, 2003, plea offer to community control and probation had she not had a rejection from Graham of the February 19, 2003, plea offer. Further, I cannot believe that Graham rejected any plea offer without discussing the offer with Petitioner and determining Petitioner's decision as to the plea offer. Graham in fact communicated the February 19, 2003, plea offer to Petitioner.

I further conclude that Petitioner rejected the February 19th plea offer, and he told Graham that he rejected it. Petitioner placed all bets on a plea offer that avoided prison, regardless of the charge. His situation had he gone to trial was grim. If the jury believed the child victim and her mother, he committed a first degree felony, and not an attempt, in violation of FLA. STAT. § 800.04(5)(a) and (b). In a "lewd and lascivious manner" he intentionally touched the breasts and genitals, and the clothing covering them, of a person under the age of 12 years. This was not attempt, if the jury believed the child victim and her mother. I realize that O'Connor had reduced the level of the

offense by suggesting the charge of an attempt in all of her plea offers, but Petitioner faced the potential of a direct charge of the underlying offense, a first degree felony, on the evidence that is before me and that was before Petitioner before he entered his plea.

Petitioner's only defense would have been his own testimony and that of his niece. Had he testified, the jury would have learned that he had a prior conviction for much the same kind of a crime against a child. Petitioner points to the testimony of his niece, but that testimony wobbles on paper and probably would have fallen completely apart on cross examination. Had she been telling the truth during her deposition, Petitioner's niece would have simply said that Petitioner woke up the child, that the child was groggy, seemed a bit startled, but went upstairs to the bathroom. Instead, she hemmed and hawed, peppering her testimony with guesses and maybes. It strikes me that she strained mightily to say that the child was merely "startled." In contrast, the deposition testimony of the child victim and her mother is direct, without equivocation, and remarkably consistent. A jury probably would not have believed either Petitioner or his niece. Facing conviction for a first degree felony if O'Connor had succeeded in getting the witnesses back to testify was a risk that Petitioner did not want to take. The plea to one year of community control and eight years of probation, under the circumstances, with early termination possible after five years, was a favorable result and exactly what Petitioner and Graham had strategically sought. I find as fact, as stated above, that Petitioner knew about the February 19th plea offer and in fact rejected it.

I also find as fact that Graham spent little time talking to Petitioner about the perils of probation. The strategy knowingly employed by Graham and Petitioner was to delay the trial, hoping that the witnesses would become unavailable, and to obtain a plea agreement that avoided prison. Sentencing jeopardy should probation be violated was of little importance, given this trial strategy. Further, I find that Petitioner was well aware of the perils of probation, given his prior conviction, his experience with revocation of probation, and his testimony at the hearing. He knew exactly how probation worked and what could happen if he violated probation.

These findings render irrelevant my previous speculation about the nature of the charge, and how this might have been related to the question of ineffective assistance of counsel with respect to the plea. I asked O'Connor about this, and I am satisfied that had she addressed this technicality, she would have drafted an information that correctly charged the offense to match the plea.

Thus, answering the factual questions remanded for an evidentiary hearing in reverse order:

1. **The exact terms and conditions of the plea offer, and counsel's response**. The February 19, 2003, plea offer was to a third degree felony in exchange for a prison sentence of 31.05 months with 28.95 months (the balance for a 5 year felony) on probation. The information charging this offense would have been drafted by the prosecutor to charge an offense achieving this result. Counsel's response to this plea offer was to convey to the prosecutor Petitioner's knowing rejection of the offer. The prosecutor then decided to send the third plea offer to counsel, the offer which Petitioner accepted.

2. **Whether Nichols' attorney actually failed to convey the plea offer to Nichols**. He did not. He orally conveyed the February 19th plea offer to Petitioner shortly after it was conveyed to him by the prosecutor.

3. **Whether Nichols' assertion that he would have preferred the February 19 offer is credible**. It was not, for the reasons set forth above. Petitioner would not accept the February 19th plea offer because it required that he spend 31 months in prison.

**Legal Analysis**

The first question, though academic here in light of the findings of fact set forth above, is whether there is a state court decision as to which this court must defer. There is not. As noted above, ground four before this court was raised in Petitioner's second Rule. 3.850 motion as ground one. The state court denied this claim without an evidentiary hearing in an order entered on June 27, 2005. Doc. 13, Exhibit H (doc. 13-6, p. 28).

The state court said:

Defendant has failed to demonstrate error on the part of counsel and/or prejudice suffered by Defendant sufficient to satisfy *Strickland v. Washington*, 466 U.S. 668, 687 (1984). The attached original and violation of probation sentencing transcripts demonstrate that Defendant's allegations are without merit and do not entitle him to the relief he seeks. The Court further points out that the "charging decision" document defendant relies on offered 31.05 months D.O.C. whereas Defendant was fortunate enough to have received a sentence of only community control and probation without any prison time. Unfortunately, Defendant failed to take advantage of this beneficial opportunity and violated his supervision shortly thereafter. Further, as point[ed] out in the previous order denying Defendant's first 3.850, the transcripts and plea form clearly indicate that at the time of sentencing Defendant understood the crime he was charged with and the terms of the plea agreement. Defendant's plea was voluntarily entered.

Doc. 13, Exhibit H (doc. 13-6, p. 28). To reach that conclusion, one must assume that the state court implicitly found that (1) Graham did not convey the February 19th plea offer to Petitioner,[9] (2) but Petitioner was not harmed because the outcome was not prejudiced. To reach this second conclusion, the state court determined that the plea deal that Petitioner accepted (1 year of community control and 8 years of probation on a second degree felony but with the jeopardy of a 15 year prison sentence if he violated community control or probation) was better on its face than the February 19th offer, a 31.05 month prison sentence for a third degree felony with the balance of the 5 years on probation, but the maximum prison exposure of 5 years.

The problem with this reasoning (as well as my own faulty reasoning in the last report and recommendation) is that it judges the "outcome" in the abstract and after the critical date. The "outcome" is not to be judged abstractly, but from the perspective of the choices that a defendant might have made with effective assistance of counsel at the time the assistance should have been provided. The critical date for this analysis is shortly after February 19th, not March 7, 2003. A guilty plea is entirely the choice of the defendant, as it involves the waiver of important constitutional rights, especially the right to a trial by jury and the right to remain silent. The question, to paraphrase from the Hill case, is whether Petitioner would have taken the February 19th plea offer had he *then* known about it and received effective assistance of counsel concerning it. It probably would have been ineffective assistance of counsel if Graham had *failed* to tell Petitioner about the chance to plead to a third degree felony for a sentence of 31.05 months, and

_____

[9] This has to be assumed since the state court did not hold an evidentiary hearing, and Petitioner's allegation must be deemed to be true.

the only question then would be prejudice to the outcome. The prejudice depends upon whether Petitioner would have accepted the February 19th offer had he been given that choice by effective counsel. The state court failed to address *this* issue, held no evidentiary hearing as to *this* issue, and therefore, there is no state court decision as to which this court must defer.

But now, after a hearing, Petitioner has failed to show either attorney error or prejudice to the outcome. Graham told him about the February 19th plea offer and he rejected it because he refused to go to prison for 31 months. Petitioner knew about jeopardy while trying to serve community control or probation, and had this been of importance to him, he would have discussed it with Graham.

Further, it is not ineffective assistance of counsel to fail to warn of collateral consequences prior to a plea. McCarthy v. United States, 320 F.3d 1230, 1234 (11th Cir. 2003) (effect on possible sentencing consequences for a future federal conviction); Johnson v. Dees, 581 F.2d 1166 (5th Cir. 1978) (denial of time off for good behavior, citing collateral consequences similarly treated in other cases, including losing the right to vote, ineligibility for parole, deportation, undesirable discharge from the military, and suspension of a driver's license); Jefferson v. Crosby, 2008 WL 681018, *20 (N.D. Fla., Mar. 6, 2008) (No. 4:04cv416-MP/EMT) (attorney error cannot be shown because sex offender registration and possibility of civil commitment under the Jimmy Ryce Act are collateral consequences of a guilty plea).[10] Moreover, "it is presumed that people will

---

[10] There is no claim that Graham gave Petitioner incorrect advice about collateral consequences. *See,* Bauder v. Department Of Corrections of Fla., 333 Fed.Appx. 422, 424 (11th Cir.(Fla.) May 28, 2009) (not selected for publication in the Federal Reporter, No. 08-10221) (citing United States v. Campbell, 778 F.2d 764, 768 (11th Cir.1985).

obey the law." <u>Donlavey v. Smith</u>, 426 F.2d 800, 801 (5th Cir. 1970).  *See,* <u>Torrey v. Estelle</u>, 842 F.2d 234, 237 (9th Cir. 1988) ("Counsel's failure to predict defendant's future return to court for resentencing is not such 'gross mischaracterization' as to be found below the level of competence demanded of defense attorneys.").

In summary, Petitioner's claim of ineffective assistance of counsel concerning the February 19th plea offer is without basis in fact, and Petitioner has not established ineffective assistance of counsel.

**Conclusion**

Accordingly, it is **RECOMMENDED** that 28 U.S.C. § 2254 petition for writ of habeas corpus filed by Jerry Lee Nichols, challenging his conviction for an attempted lewd and lascivious act upon a child, in the Circuit Court of the Fourteenth Judicial Circuit, in and for Bay County, Florida, case number 02-402H, be **DENIED WITH PREJUDICE**.

**IN CHAMBERS** at Tallahassee, Florida, on December 28, 2009.


s/     William C. Sherrill, Jr.
**WILLIAM C. SHERRILL, JR.**
**UNITED STATES MAGISTRATE JUDGE**


<u>**NOTICE TO THE PARTIES**</u>

**A party may file specific, written objections to the proposed findings and recommendations within 14 days after being served with a copy of this report and recommendation.  A party may respond to another party's objections within 14 days after being served with a copy thereof.  Failure to file specific objections limits the scope of review of proposed factual findings and recommendations.**

Case No. 5:06cv58-RS/WCS